IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEREMIAH LAMBERT,

                          Plaintiff,

                v.

DR. KENNETH ADLER,

                         Defendant.

OPINION AND ORDER

11-cv-418-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

On December 6, 2008, while an inmate at the New Lisbon Correctional Institution in Wisconsin, plaintiff Jeremiah Lambert filed a Health Services Unit request, complaining of sharp pains in his right ear. A year and a half later, he had the first of two surgeries to rebuild his eroded ear drum. Before he entered prison, he had adequate hearing; by August 2010, he needed a hearing aid for his right ear.

Plaintiff contends that defendant Dr. Kenneth Adler violated plaintiff's rights under the Eighth Amendment because he was deliberately indifferent to plaintiff's complaint of ear problems on two occasions. First, on July 21, 2009, the only time he saw plaintiff, he did not recognize the seriousness of plaintiff's problems and refused to refer plaintiff immediately to an ear, nose and throat specialist. Second, as head of one of the Department of Corrections' two "Prior Authorization Committees," he did not make sure that plaintiff was referred to an ear specialist in October 2009, when the doctor overseeing plaintiff's care

1

at the New Lisbon prison made his first request for plaintiff to have a consultation with an ear specialist.

No one denies the seriousness of plaintiff's hearing loss or the pain he suffered before, during or immediately after the surgeries.  The question is whether plaintiff has proven that the hearing loss is the consequence of deliberate indifference on the part of defendant, which is the standard he must meet.  Deliberate indifference requires a showing that the treatment provided was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the condition, Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996), or, stated differently, treatment that is "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment."  Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008).

After hearing the evidence at trial, I conclude that plaintiff has not proven his case. The evidence does not show that defendant acted with deliberate indifference to plaintiff's medical condition when he decided not to refer plaintiff to a specialist on the one day he saw him or later when requests for consultations came to the Prior Authorization Committee he chaired.

From the evidence adduced at the court trial held on November 12-13, 2013, I find the following facts.


FACTS

Plaintiff is 33 years old and is serving a sentence of 16 years, with a discharge date

2

in 2020.  At all relevant times, he was housed at the New Lisbon Correctional Institution, in New Lisbon, Wisconsin.

1. Plaintiff's treatment at New Lisbon

Plaintiff saw defendant for the first and only time on July 21, 2009, when defendant was filling in for Dr. Glen Heinzl, the doctor assigned to the New Lisbon prison.  Before the July visit, plaintiff had submitted Health Services Requests on four different occasions, starting in December 2008, complaining of pain or bleeding from his ear.  He had been seen by nurses in response to each complaint and for an additional check up and had been prescribed irrigation to remove excess wax from his right ear (December 16), oral antibiotics on one occasion (December 27) and antibiotic ear drops on a third occasion (March 14, 2009).  The nurses who saw plaintiff on these visits examined his ears on each occasion but never observed a perforated tympanic membrane (ear drum).

On July 19, 2009, plaintiff submitted a fifth request about his ear, saying that he had been having sharp pains in his right ear again.  He told the nurse who saw him on July 21 that he had pain equal to a six out of ten during the previous week and that three days earlier, he had clear liquid draining from his ear.  After assessing tenderness in plaintiff's right ear and lower jaw, a bubbled area near or on the tympanic membrane and no hearing problem, the nurse turned plaintiff over to defendant.

Plaintiff told defendant that his right ear had been popping and that he had had jaw and throat discomfort for a week.  Defendant observed tiny bubbles behind plaintiff's

tympanic membrane, which he associated with plaintiff's serous otitis, also known as otitis media with effusion. He saw a "small bloody bleb," the size of a pinhead, on the typanic membrane. He found the significance of the bloody bleb "unclear," but he suspected it would go away. He saw no holes in the tympanic membrane and no purulent pus. Plaintiff had no apparent difficulty hearing even the slight sound of defendant's brushing his fingers with his thumb, which defendant uses as an informal hearing test.

Defendant saw only one earlier reference in plaintiff's medical record to acute otitis media in March. He believed that this episode was probably of one week's duration. (Acute otitits media is not the same condition as serous otitis media, which is what defendant believed plaintiff had in July. According to uptodate.com, a medical subscription service that is written by doctors and updated regularly and that the parties agree is a reliable source,

> Acute otitis media (AOM): is an acute illness marked by the presence of middle ear fluid and inflammation of the mucosa that lines the middle ear space. Examination typically demonstrates tympanic membrane redness, opacification, bulging . . . In addition, there may be purulence in the ear canal (otorrhea) if there is an associated tympanic membrane rupture. . . .
>
> Otitis media with effusion (OME), also called Serous otitis media: is defined by the presence of middle ear fluid without acute signs of illness or inflammation of the middle ear mucosa. OME usually follows AOM but can result from barotraumas [injury sustained from failure to equalize the pressure of an air-containing space with that of surrounding environment] or allergy. OME typically leads to a conductive hearing loss and can be a precursor to retraction and perforation of the tympanic membrane. Eustachian tube dysfunction is often a predisposing factor.
>
> Chronic otitis media (COM): is diagnosed in an ear with a tympanic membrane perforation in the setting of chronic ear infections, such as an ear with chronic purulent drainage despite appropriate antibiotic treatment . . . .)

Plt.'s exh. #1 at 616.

Chronic serous otitis media is associated with chronic purulent drainage through a perforated tympanic membrane.  Uptodate.com, plt.'s exh. #1 at 617.

Defendant chose to follow his usual practice when treating patients for OME (otitis media with effusion):  prescribing a decongestant and observing the patient for six weeks. This is also the treatment for OME recommended in uptodate.com:

> **Treatment for OME —** In most cases, OME resolves spontaneously without treatment. . . . [In adults], [d]econgestants might cause some symptom relief by alleviating nasal congestion.  A majority of effusions will resolve over the course of 12 weeks, and most patients can be observed over this time period.

Id. at 625.

In defendant's experience, an ear problem such as plaintiff had on July 21 almost always clears up by itself.  He scheduled a followup visit with a nurse in one week, primarily so that plaintiff would not feel abandoned and would know plaintiff that his complaints were being taken seriously.  He scheduled a visit with Dr. Heinzl in one month.  (In fact, Dr. Heinzl did not see plaintiff until October 5, 2009.)

Defendant spent 20-30 minutes with plaintiff.  At the end of the session, he had plaintiff sit on the examining table while defendant sat in a lower chair, something he does to give his patients a greater sense of being in control.  Defendant told plaintiff he was not going to recommend sending him to a specialist at that time.  Plaintiff became angry and pressed defendant.  Defendant told him that the session was over and asked whether he needed assistance from correctional officers to leave the Health Services Unit.  Plaintiff left. (Plaintiff testified that defendant became angry at him, accusing him of just wanting a field

5

trip to see the doctor and having no appreciation of the cost of a visit to an outside consultant, but this testimony is not credible.  Plaintiff never complained of any offensive comments from defendant, either to the Health Services Unit or in the two inmate complaints he filed about this matter in 2010.)

Defendant had three reasons for not sending plaintiff to a specialist in July:  plaintiff had had only one episode of suspected acute otitis media (in March); he had significant symptoms of otitis media with effusion in July and they had persisted for only one week; and neither defendant nor the nurse had detected any perforation of his ear drum as of July 21. He thinks plaintiff might have had a resolved perforation when he saw him but he saw no evidence of any tympanic membrane perforation before July.

In the months after defendant saw him, plaintiff saw a nurse on August 6, 2009 and again on September 9 and 21, 2009.  In August, the nurse observed that plaintiff's right tympanic membrane had a slight bulge, but no redness, no drainage, no swelling in the outer ear and jaw and no tenderness.  On September 9, the nurse noted that plaintiff's right ear canal was red, with what appeared to be a sore that was white with a red ring about it, but he observed no drainage and described plaintiff's tympanic membrane as intact and visible. On September 21, plaintiff's right ear canal was still red and his tympanic membrane was white with red stripes and no drainage.  He complained of daily drainage that sometimes smelled bad.  A small amount of brown wax was noted in the ear canal.  A nurse practitioner diagnosed otitis externa and otitis media and prescribed amoxicillin and cortomycin drops.

On October 5, plaintiff saw Dr. Heinzl and told him that the smelly drainage had

gone away after he started taking the drops and oral antibiotics, but his right ear still clicked and he seemed to have decreased hearing. Dr. Heinzl noted that plaintiff's tympanic membrane was still red, although "subacute," and had white stripes. His assessment was serous otitis media, chronic. He thought plaintiff should be seen by an ear specialist and filed a request for a consultation with the prior authorization committee. In his request, he noted that plaintiff's ear problem had persisted although he had been prescribed antibiotics, ear drops and decongestant. He indicated that a consultation was advisable because plaintiff's hearing seemed to be affected, "some days more than others."

Dr. Heinzl's request was denied the next day by the 12-member prior authorization committee headed by defendant. (The committee has a membership of about 3/4 doctors and 1/4 nurse practitioners, all of whom practice in the prison system. It is one of two such committees that handles requests for outside consultations and non-emergency procedures for the entire system. It has no budget and no financial limits on the requests it approves. At its weekly meetings, it considers between 10-20 requests and decides by consensus, with an opportunity for dissenting members to register their views. No one person has any veto power, including the chair. The committee also provides an opportunity for the practitioners to seek help for particular medical problems they are experiencing in their practices.) The committee did not agree with Dr. Heinzl that an outside consultation was appropriate. Instead the members agreed unanimously that he should prescribe a round of Cipro for three weeks and re-evaluate plaintiff's condition in two months. In considering Dr. Heinzl's request, defendant had no memory of having seen plaintiff in July while filling in at New

Lisbon.

Plaintiff saw Dr. Heinzl again on October 23, after filing a Health Services Request in which he complained of continuing pain and drainage. He told the doctor that his right ear had "crackles," muffled hearing and intermittent drainage. Dr. Heinzl saw no perforation of the tympanic membrane but observed it to be somewhat distorted. His assessment was serous otitis/Eustachian tube dysfunction. He told plaintiff to finish his Cipro and take a decongestant and he scheduled an audiogram. The audiogram showed conductive hearing loss.

On December 7, Dr. Heinzl saw plaintiff again, noting a distorted tympanic membrane with a suggestion of fluid behind it in plaintiff's right ear. The same day, he resubmitted his earlier request for a consultation, but the committee did not approve it. Instead, it suggested that he call a specialist for advice.

Plaintiff continued to complain about his ear. On January 20, 2010, Dr. Heinzl placed a call to a specialist who said he wanted to see plaintiff so he could visualize the adenoid tissue and the Eustachian tube orifice. The next day Heinzl prepared his third submission to the committee, which approved it on January 26, 2010.

On February 22, 2010, a specialist assessed chronic otitis media with subtotal tympanic membrane perforation. In August 2010, plaintiff had surgery to remove his polypoid middle ear inflammatory tissue and perform a reconstruction of his tympanic membrane. On July 6, 2011, he had ossicular reconstruction with a total ossicular replacement prosthesis. He was fitted for a hearing aid and provided one that he still wears.

8

2. <u>Expert witness</u>

Dr. Gregory Brotzman testified at trial as an expert witness.  He is a licensed family medicine physician and a faculty member of the Medical College of Milwaukee.  It is his opinion that defendant was deliberately indifferent to plaintiff's serious medical needs, which had been ongoing for seven months before defendant saw him and which had included bleeding, discharge and pain.  He testified that defendant's indifference led to plaintiff's hearing loss and the need for the two surgeries to repair his right ear.  Furthermore, he criticized defendant for not realizing on July 2009 that plaintiff had a serious, ongoing problem with his right ear that had been diagnosed previously by medical professionals and required treatment by a specialist.  Dr. Brotzman thinks it was obvious on July 21 that plaintiff had chronic suppurative otitis media, that is, tympanic membrane perforation and drainage, along with recurrent or chronic ear infections that had persisted for six weeks or longer.  It is his opinion that plaintiff had had two perforations of his tympanic membrane before July 21 and that the accumulated evidence should have been enough to cause defendant to send plaintiff to a specialist.  At the least, he believes, defendant should have realized that he needed a specialist's opinion about the significance of the bloody bleb, which defendant was unable to assess.  He believes that a specialist would have recognized the bloody bleb as evidence that plaintiff's tympanic membrane had been perforated.

Dr. Brotzman believes that defendant exercised independent medical judgment when he saw plaintiff but that he reached the wrong result.  He characterizes defendant's treatment of plaintiff as "beyond negligence."  It is his belief that defendant would have recommended

9

plaintiff for a consultation had plaintiff not argued with defendant about the matter and that if defendant had sent plaintiff for a consultation in July 2009, there would have been less destruction of his ear.

As for defendant's role on the Prior Authorization Committee, Dr. Brotzman thinks that defendant was responsible for the denial of Dr. Heinzl's requests because he was the chair.  He cannot understand why the prior authorization committee voted to refuse Dr. Heinzl's request to have a specialist examine plaintiff's ear; he saw no medical reason for the decision.

Dr. Brotzman never examined plaintiff and never spoke to defendant or Dr. Heinzl about plaintiff.

OPINION

The primary question to be decided in this case is whether defendant's failure to refer plaintiff to a medical specialist to evaluate his ear problems was deliberate indifference within the meaning of Estelle v. Gamble, 429 U.S. 97, 104-05 (1976), that is, whether it was a decision so far afield of accepted professional judgment, practice or standards as to demonstrate that defendant was not basing his decision on such a judgment.  Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996).

A claim of deliberate indifference to a serious medical need includes both an objective and subjective component.  The objective component requires a showing that the medical need is "objectively, sufficiently serious."  Farmer v. Brennan, 511 U.S. 825, 834 (1994). The

10

Court of Appeals for the Seventh Circuit has defined "serious medical condition" as one that has been diagnosed by a doctor as mandating treatment or as one that is so obvious that even a lay person would perceive the need for a doctor's attention. Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005) (citing Foelker v. Outagamie County, 394 F.3d 510, 512-12 (7th Cir. 2005)). As for the subjective component, the plaintiff must show that the defendant officials acted with a "'sufficiently culpable state of mind,'" id. at 653 (quoting Farmer, 511 U.S. at 834). In other words, the officials must know of and disregard an excessive risk to inmate health; they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." Id. (quoting Farmer, 511 U.S. at 837).

In this case, I will assume that plaintiff had a serious medical need when he saw defendant. However, plaintiff has not adduced evidence sufficient to show that defendant was deliberately indifferent to plaintiff's complaints of ear pain when he saw plaintiff on July 21, 2009 or when he chaired the Prior Authorization Committee.

Plaintiff's medical expert, Dr. Brotzman, has no criticisms of defendant's medical examination of plaintiff. He testified that plaintiff exercised medical judgment when he declined to refer plaintiff to a consultation after seeing him on July 21, 2009. He believes that defendant was "beyond negligent" when he did not send plaintiff to a consulting physician after seeing him on July 21, but in reaching this conclusion, Dr. Brotzman relies on a questionable interpretation of the medical chart. He believes, for instance, that plaintiff had had bleeding from his ear for seven months before he saw defendant, but the chart shows

only two instances of bleeding, one in December 2008, one in January 2009 and none after that.  He believes that plaintiff was suffering from chronic supperative otitis media when he saw defendant in July but plaintiff did not complain of any discharge other than clear liquid and he had no sign of a perforated tympanic membrane, with the possible exception of the bloody bleb.  In any event, even if defendant was wrong and Dr. Brotzman is right, more than a difference of opinion is needed to show deliberate indifference.  Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006) ("a difference of opinion among physicians as to how an inmate should be treated cannot support a finding of deliberate indifference.") (citing Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001), and Estate of Cole by Pardue v. Frumm, 94 F.3d 254 (7th Cir. 1996)).  In addition, more than mere negligence must be shown. Farmer v. Brennan, 511 U.S. 825 (1994).

Dr. Brotzman attributes defendant's refusal to send plaintiff to a specialist to plaintiff's offensive comments to defendant, but this makes little sense.  Even if I had found reason to believe plaintiff's testimony that he challenged defendant, he testified that he made his statements *after* defendant had told him he would not send him to a specialist.

Defendant spent 20-30 minutes with plaintiff on July 21, examining him and then talking to him about his plan to treat plaintiff's ear with a decongestant.  He arranged for a followup visit to the Health Services Unit in a week, so that plaintiff "would not feel abandoned."  This is not the conduct of a person who is deliberately indifferent to his patient's needs.

Finally, there is no evidence that defendant had any part in preventing plaintiff from

12

seeing a specialist until February 2010.  Defendant did not remember having seen plaintiff at New Lisbon, but even if he had, he was merely one of a committee of 12.  The evidence in the record shows that the committee members acted independently and in reliance on their own professional judgment.  The entire group considered each request and did so without any financial limitations on its decisions.

Would the medical personnel who saw plaintiff or who voted against his request to see a consultant want to turn back the clock and make different decisions, now that they have the benefit of hindsight?  No doubt.  No one can be happy that plaintiff lost part of his hearing and had to undergo two painful operations to restore structures in his ear, but this outcome was not the result of any constitutional violation by defendant.

## ORDER

Having found that plaintiff Jeremiah Lambert has failed to prove that defendant Kenneth Adler, M.D., acted with deliberate indifference to plaintiff's serious medical need, I am directing the clerk of court to enter judgment in favor of defendant and close this case.

Entered this 19th day of November, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

13